UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


EVELYN H. GREEN,                    )
                                   )
            Plaintiff,             )
                                   )
       vs.                         )        No. 4:06CV1094-DJS
                                   )
METRO/BI-STATE DEVELOPMENT AGENCY, )
                                   )
            Defendant.             )


## MEMORANDUM AND ORDER


Now before the Court is defendant Metro/Bi-State Development Agency's ("Bi-State") motion for summary judgment. The matter has been fully briefed and is now ripe for disposition.

## Procedural History

On July 19, 2006, pro se plaintiff Evelyn Green ("Green") filed a complaint with the Court. Green alleges discrimination and retaliation in violation of 42 U.S.C. § 1981 (Count II); violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (Count III); outrageous conduct (Count V); negligent infliction of emotional distress (Count VI); and intentional infliction of emotional distress (Count VII).[1] On August 9, 2007, Bi-State filed its current motion, seeking summary judgment on all counts against it. Green opposes Bi-State's motion, and argues that material facts exist for trial for all counts.

---

[1]Counts I and IV have been dismissed. See Doc. ##18, 27.

**Standard of Review**

As an initial matter, the Court notes that Green is a pro se litigant, and as such her pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." <u>Ellis v. Butler</u>, 890 F.2d 1001, 1003 (8th Cir. 1989) (citing <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972)). In considering a motion for summary judgment, the Court must "view all of the evidence in the light most favorable to the nonmoving party and [will] give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." <u>Reich v. ConAgra, Inc.</u>, 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." <u>Id.</u> "Although the moving party has the burden of demonstrating the absence of genuine issues of material fact, the 'nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial.'" <u>Burchett v. Target Corp.</u>, 340 F.3d 510, 516 (8th Cir. 2003) (quoting <u>Rose-Maston v. NME Hosps., Inc.</u>, 133 F.3d 1104, 1107 (8th Cir. 1998)).

In ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world

apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). Consequently, in order to withstand a motion for summary judgment, evidence submitted by a non-movant must contain specific facts, and general statements will not be supplemented by a court's assumptions.

> It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

<u>Id. at 889</u>; <u>see also</u> <u>Stanback v. Best Diversified Prods., Inc.</u>, 180 F.3d 903, 909 (8th Cir. 1999) ("[G]eneral statements in affidavits and deposition testimony...are insufficient to withstand a properly-supported motion for summary judgment.") (citations omitted); <u>Allen v. Entergy Corp.</u>, 181 F.3d 902, 905 (8th Cir. 1999) ("[Plaintiff's] conclusory affidavit 'is devoid of any specific factual allegations'...and as such, it cannot withstand a properly supported summary judgment motion.") (quoting <u>Flannery v. Trans World Airlines, Inc.</u>, 160 F.3d 425, 428 (8th Cir. 1998)).

## **Facts**

For purposes of this motion, the Court finds that the following facts are not in dispute, or have not been specifically controverted pursuant to E.D.Mo. L.R. 7-4.01(E).[2]  Green is an African-American female.  In 2000, she started work as a bus operator for Bi-State in Missouri.  During her tenure, she suffered several job-related injuries, including falling while at work, being assaulted with a cane by a passenger, and having a firearm brandished in her presence by a passenger.  In all of these instances, she followed workers compensation protocol and received immediate medical treatment.

Green's medical records indicate that sometime in October or November of 2004, she started having increased pain in her hands, but that she could not recall any discrete accident or injury which led to that pain.  She consulted her family physician, who referred her to a doctor for electrodiagnostic studies.  On January 14, 2005, Green was seen by Dr. William Sprich ("Dr. Sprich"), who diagnosed her with bi-lateral carpal tunnel syndrome — a condition he opined was related to her work.  Because of her condition, Green stopped reporting to work.

On January 17, 2005, Willie James ("James"), one of Green's supervisors, informed Carol Campbell ("Campbell"), Bi-State's workers compensation claims manager, that Green wanted to

---

[2]"All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."  E.D.Mo. L.R. 7-4.01(E).

report a workers compensation claim for her hands.  Campbell told James not to send Green to BarnesCare for medical treatment, but rather to have Green fill out an employee injury statement.

Green filed an employee injury statement with Bi-State, alleging an injury onset date of January 14, 2005.  On January 19, 2005, Campbell made the decision that Green should be sent to a doctor to diagnose Green's condition, and to determine whether that condition was work related.  Accordingly, Green was notified by Manoka Collins ("Collins"), a claims analyst, that an appointment with Dr. Bernard Randolph ("Dr. Randolph"), a Bi-State physician, was scheduled for February 3, 2005.  On February 15, 2005, Bi-State received a report from Dr. Randolph, wherein he opined that she did have carpal tunnel syndrome; that her work activities were a substantial factor to the development of that condition; and that she should avoid driving a bus.

Bi-State contends that Dr. Randolph rendered his February 15, 2005, opinion without the benefit of Green's medical records, and that upon review of those records on February 22, 2005, Dr. Randolph wrote a supplemental report stating his opinion had changed in that he believed that Green's "underlying systematic illness" was the substantial factor in the development of her condition.  Consequently, Bi-State did not immediately approve Green's claim; instead, it forwarded her claim to an attorney.  By March 8, 2005, no decision had been made with regard to her claim,

and Green asked the Division of Workers Compensation to file the matter for a hardship hearing.  That hearing was scheduled on April 12, 2005.  The judge for the hearing decided he wanted another medical opinion, and selected Dr. Richard Coin ("Dr. Coin").  Green was examined by Dr. Coin on April 26, 2005.  He diagnosed Green with carpal tunnel syndrome, and opined that she should have carpal tunnel release surgery.  As to the cause, he stated that both the bus driving and another condition separate from her job (what he referred to as partial connective tissue disorder) were "non substantial aggravating factors" of her carpal tunnel syndrome, and that the combination of the two was enough to cause Green's condition.  Dr. Coin further opined that Green's bus driving duties were a more substantial factor to the development of her condition.  Finally, Dr. Coin stated that, despite her condition, he believed Green could work regular duties.

Pursuant to Dr. Coin's report, on May 5, 2005, an attorney for Bi-State sent a letter to Collins stating that Green would likely receive workers compensation benefits, but that, because it was Dr. Coin's opinion that Green could work regular duties, Bi-State did not need to provide Green with any lost time benefits.  Bi-State sent Green to Dr. R. Evan Crandall ("Dr. Crandall") for surgery.  After an initial visit on June 8, 2005, Dr. Crandall indicated that Green could work full duty until the time of surgery.  He scheduled two surgeries, one occurring on June

13, and the other occurring on June 23.  Subsequent to both surgeries, on July 21, 2005, Green had a follow-up visit with Dr. Crandall.  Dr. Crandall noted that Green's incisions were healing well, and that she could return to all activities without restriction.

As stated in Bi-State's agreement with the transit union, if an employee with fewer than ten years of service:

> has been off work due to illness or injury (regardless of whether the injury is covered by Workers' Compensation) for a period of six (6) months a [Bi-State] Physician shall examine the employee.  If the physician determines that the employee is permanently unable to return to work, the employee shall be dropped from the payroll.

On June 2, 2005, Bi-State sent Green a letter reminding her of that policy, and stating that, due to her inability to work for over six months, she would be terminated effective June 8, 2005.

Green was not released from work on June 8, 2005; rather, she received another letter dated July 14, 2005, which stated that her employment with Bi-State would be terminated effective July 22, 2005, unless she could present medical documentation that she would be able to report to work and preform the duties of her bus operator position on or before July 22, 2005.

On July 22, 2005, Green saw a Bi-State physician, Dr. Timothy Anderson ("Dr. Anderson"), for a return to work evaluation. Dr. Anderson's evaluation states that:

> [Patient] has not worked since January.
> [Patient] states she is taking Vicodin - did not
> receive from surgeon, another doctor.[3] [Patient]
> states "can't work" — has no insight. States if
> want to send me out there [and] "injure others"
> that's on you!! Safety is first issue.
> [Patient] does not understand at all difference
> between can't [and] won't. Very low motivation
> to return to work. [Patient] wants me to say
> "I'm unable to work." No objective
> finding....[Patient] has no physical reason not
> to [return to work]...."

That day, Green reported to work, and presented the return to work evaluation stating that she was able to return to duty.

Green reported to work July 25, 2005, at 8:00 a.m. At 10:55 a.m., Green stated her intention to go home because of pain in her hands. James reminded Green that her shift was eight hours long, and that if she left, "it would be on her." Green signed out and went home. James sent his supervisor, Ron Stephens ("Stephens"), an e-mail describing what happened. Stephens responded by stating that Green failed to comply with the terms and conditions of her reinstatement as set forth in the July 14, 2005, letter, and that — since she had medical documentation stating she could return to work, but failed to perform the duties of her position — she was terminated from her employment with Bi-State.

Green states that Bi-State's refusal to send her to get immediate care for her hands was improper. Green also states that Bi-State unnecessarily prolonged the time between her filing of the injury report and the carpal tunnel surgery. Finally, Green states

---

[3]It is not clear who prescribed Green Vicodin.

that Bi-State is intentionally withholding compensation to which she is entitled (which she states accrued from her alleged injury onset date of January 14, 2005, to the date of her first surgery, June 13, 2005).[4]

Green states that another Bi-State employee, Patsy Rodriguez ("Rodriguez"), a Caucasian female, filed a workers compensation claim for carpal tunnel syndrome and received immediate medical treatment and compensation. Green acknowledges that Rodriguez has a different supervisor, and that at the time Rodriguez filed her claim she worked in Illinois. Rodriguez made her claim in 1999, and in 2000, Bi-State changed its investigation procedures for carpal tunnel cases. Green alleges that there is no difference in Bi-State's procedures between Missouri and Illinois, but does not controvert Bi-State's assertion that it changed its policies in 2000. Other than a Bi-State employee's affidavit, no evidence has been submitted detailing Bi-State's investigation procedures in 1999 and Bi-State's current investigation procedures.

Green states that another Bi-State employee, Paul Becker ("Becker"), a Caucasian male, committed a terminable offense when he assaulted a passenger. Although he was originally terminated, he was later reinstated. In an affidavit, Green further alleges, without specification, that African-American bus operators who

---

[4]However, Green acknowledges that, from the date of the first surgery, June 13, 2005, to the date she was released to work, July 21, 2005, she received some compensation.

"committed such an act are not reinstated."  Doc. #49, Exhibit 4, ¶9.

Finally, Green attests that in 2002 she was "exposed to a Workers Compensation Multiple Claims-Target List produced by Bi-State which included [her] name and that of Leon Bueler a white male Bus Operator. [She] was terminated and Mr. Bueler was not." Doc. #49, Exhibit 4, ¶5.  However, Green has not produced <u>any evidence</u> concerning the nature or existence of that list.

### Discussion

Green's complaint asserts federal claims pursuant to 42 U.S.C. § 1981 and the ADA, and state law claims of outrageous conduct, negligent infliction of emotional distress, and intentional infliction of emotional distress.  Bi-State, however, argues that Green has not alleged sufficient facts to withstand its motion for summary judgment.  The parties' arguments are discussed below.

## A. Race Discrimination and Retaliation Under 42 U.S.C. § 1981

Green's complaint alleges that, during her tenure with Bi-State, she was "unlawfully discriminated against in the terms, conditions and privileges incident to his [sic.] employment...because of his [sic.] race, retaliation, all in violation of 42 U.S.C. Section 1981." Doc. #3, p. 7.  Bi-State was created as a single interstate agency pursuant to a compact between Missouri and Illinois "to coordinate regional planning and

development of the Bi-State Metropolitan Development District."
Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp., 948
F.2d 1084, 1085 (8th Cir. 1991). "[S]tate law treats Bi-State like
a county or municipality. The compact characterizes Bi-State as 'a
body corporate and politic,' Mo. Rev. Stat. § 70.370 art. III,
which indicates Bi-State is a municipal corporation subject to suit
under section 1983." Id. at 1087 (emphasis added).

As a municipality, Bi-State can be held liable for the
acts of its employees in contravention of the civil rights of
individuals, but only upon a showing that a plaintiff's
"constitutional rights were violated by an 'action pursuant to
official municipal policy' or misconduct so pervasive among
non-policymaking employees of the municipality 'as to constitute a
custom or usage with the force of law.'" Ware v. Jackson County,
Mo., 150 F.3d 873, 880 (8th Cir. 1998) (quoting Monell v. Dep't of
Soc. Servs., 436 U.S. 658, 691 (1978)).

Municipal liability can stem from a policy officially
adopted and promulgated by a municipality. While "municipal
liability for violating constitutional rights may arise from a
single act of a policy maker, that act must come from one in an
authoritative policy making position and represent the official
policy of the municipality." McGautha v. Jackson County, Mo., 36
F.3d 53, 56 (8th Cir. 1994) (citations omitted). Accordingly, when
considering an official's discretionary acts that are constrained

by policies not of that official's making, "those <u>policies</u>, rather than the subordinate's departure from them, are the act of the municipality." <u>Id.</u> (emphasis added).

If a plaintiff cannot demonstrate discrimination pursuant to an official policy, then it is incumbent on that plaintiff to produce evidence of a practice so permanent and well-settled it can fairly be labeled an established custom. In other words, the evidence must demonstrate misconduct that is so pervasive among non-policy making employees it is applied with the force of law. <u>Id.</u> A plaintiff can show an established custom by presenting evidence indicating:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation.

<u>Ware, 150 F.3d at 880</u>. (alterations in original) (quoting <u>Jane Doe A v. Special Sch. Dist.</u>, 901 F.2d 642, 646 (8th Cir. 1990)). While a single act or incident can establish liability pursuant to an official policy, "[l]iability for an unconstitutional custom...cannot arise from a single act." <u>Id.</u> at 882 (quoting <u>McGautha</u>, 36 F.3d at 57).

Green, in her brief in opposition to Bi-State's motion for summary judgment, argues the following:

> Plaintiff has adequately plead in her official complaint that Defendant maintains a pattern, practice and policy of racial and other discrimination and retaliation. Defendant gave false pretextual reasons for actions taken in regard to Plaintiff. That being said the allegations therein must be viewed in a light most favorable to the plaintiff and accept all factual allegations and permissible inference from the allegations as true.

Doc. #48, p. 3. However, at the summary judgment stage, a court looks beyond the pleadings, and (in this case) must be presented with specific facts and evidence regarding the existence of an official policy or established custom which caused Green to be subjected to racially disparate or retaliatory treatment in employment opportunities, terms, and conditions.

In paragraph 24 of her complaint, Green alleges that Bi-State "maintains a...policy of racial and other discrimination and retaliation in employment opportunities, terms and conditions." Doc. #3, p. 7. Aside from this allegation, Green offers no evidence regarding the existence of an official Bi-State policy which caused her to be subjected to a deprivation of constitutional rights.

To demonstrate an established custom of racial discrimination, Green offers specific evidence of a single incident of a Caucasian receiving dissimilar treatment. Green states that when Rodriguez filed a workers compensation claim for carpal tunnel

syndrome, she received immediate medical treatment and compensation. Even ignoring Bi-State's uncontroverted evidence distinguishing Rodriguez's situation from Green's situation, as stated above, it is the law of this circuit that evidence of a single incident of disparate treatment is not enough to demonstrate an established custom to accord municipal liability.[5] <u>See</u> <u>McGautha</u>, 36 F.3d at 57. Accordingly, Green has failed to provide sufficient evidence to establish municipal liability and overcome Bi-State's motion for summary judgment.

Green's complaint also brings a 42 U.S.C. § 1981 claim of retaliation.[6] However, she has offered no additional evidence, beyond this general averment, of a policy or custom to support such

---

[5]Green also offers evidence of Becker, a Caucasian who, after being fired for assaulting a passenger, was subsequently reinstated. Although Green avers in paragraph 9 of her affidavit that "Black bus operator's [sic.] to commit such an act are not reinstated," Green has not offered any specific evidence of a similarly-situated African-American employee who received disparate treatment. Doc. #49, Exhibit 4, ¶9. Further, the Court finds that Green's conduct and Becker's conduct are so dissimilar that the two situations are simply not comparable.

Similarly, Green offers no specific evidence to support her claim that she was included on a "Workers Compensation Multiple Claims-Target List," nor any argument detailing the significance of such a list. Additionally, even if the Court had sufficient evidence to consider Green's general averment, the lack of a temporal proximity to the employment action at issue in this case undercuts such a list's significance.

[6]At her deposition, Green stated that Bi-State retaliated against her because she "had a disability." Further, when asked why Bi-State retaliated against her, she responded by stating: "[j]ust evil, just evil, just wrongful, unlawful." Doc. #49, Exhibit 3, p. 6. The Court notes that if her claim is one for retaliation based on her <u>disability</u>, it is not a cognizable claim brought pursuant to 42 U.S.C. § 1981.

a claim.  Accordingly, she has failed to establish municipal liability for a claim of race-based retaliation.

It is the finding of this Court that the record is bereft of sufficient evidence to support a finding that <u>race issues</u> had any effect on the terms and conditions of Green's employment. Accordingly, as a matter of law, given the information on the record, no reasonable factfinder could conclude that Green's treatment was pursuant to any official policy or established custom to treat African-American employees differently than Caucasian employees were treated.  In the absence of a finding that there was an official policy or established custom of race discrimination, the Court will grant summary judgment in Bi-State's favor as to Green's 42 U.S.C. § 1981 claim.

## B. ADA Claim

The ADA prohibits an employer from discriminating against an employee "'because of the disability of such individual.'" <u>Wood v. Crown Redi-Mix, Inc.</u>, 339 F.3d 682, 686 (8th Cir. 2003) (quoting 42 U.S.C. § 12112(a)). Employment discrimination claims brought under the ADA are analyzed under the familiar burden-shifting scheme developed in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>Rehrs v. Iams Co.</u>, 486 F.3d 353, 356 (8th Cir. 2007). Under the <u>McDonnell Douglas</u> framework, the initial burden rests with a plaintiff, who must establish a prima facie case of discrimination by a preponderance of the evidence.  <u>St. Mary's</u>

Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); see also Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 616 (8th Cir. 2007). To do so, a plaintiff must show that "[s]he (1) had a disability within the meaning of the ADA; (2) was qualified, with or without a reasonable accommodation, to perform the essential job functions of the position in question; and (3) suffered an adverse employment action because of [her] disability." Rehrs, 486 F.3d at 356.

With regard to a plaintiff's initial burden of proving a prima facie case, the Supreme Court has stated that "an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 199 (2002). Further, "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term." Id. at 198 (emphasis added); see also Pittari v. Am. Eagle Airlines, Inc., 468 F.3d 1056, 1062–63 (8th Cir. 2006) ("In determining whether a person is substantially limited in a major life activity, we consider (1) the nature and severity of the impairment, (2) its duration or anticipated duration, and (3) its actual or expected long-term impact. Under the ADA, a temporary impairment with little or no long-term impact does not constitute a disability.")

(emphasis added) (citations omitted). The Supreme Court has further stated that "manual tasks unique to any particular job are not necessarily important parts of most people's lives. As a result, occupation-specific tasks may have only limited relevance to the manual task inquiry." Toyota Motor Mfg., 534 U.S. at 201.

After a plaintiff has made a sufficient showing of a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. Gordon v. Shafer Contracting Co., 469 F.3d 1191, 1196 (8th Cir. 2006). Once such a reason is articulated, the burden of production shifts back to the plaintiff to demonstrate that the proffered nondiscriminatory reason is a pretext for intentional discrimination. Id. At this third stage of the McDonnell Douglas framework, "'an employee's attempt to prove pretext...requires more substantial evidence [than it takes to make a prima facie case]...because unlike evidence establishing a prima facie case, evidence of pretext...is viewed in light of the employer's justification.'" Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005) (alterations in original) (citations omitted). "Because the employer's 'motive and intent are at the heart of a discrimination case,' the central inquiry 'is whether [disability] was a factor in the employment decision at the moment it was made.'" E.E.O.C. v. Wal-Mart Stores, Inc., 477 F.3d 561, 570 (8th Cir. 2007) (alteration in original) (quoting Sabree v. United Bhd.

of Carpenters & Joiners Local No. 33, 921 F.2d 396, 403 (1st Cir. 1990)).  A plaintiff "may prove pretext by showing that the employer's stated reason for the adverse employment action has no basis in fact," or by otherwise showing the employer was not actually motivated by the stated reason.  Id. (citing Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006)).

In this case, Green argues in her brief that it is "undisputed that Plaintiff had been diagnosed with carpal tunnel and was for a temporary time disabled due to the condition," and that she "was substantially limited in the major life activities of lifting, reaching, or working."  Doc. #48, p. 7.  Green's own arguments contravene the first element of a prima facie case — that she was disabled within the meaning of the ADA.  Specifically, the Court notes that Green argues that her condition was "temporary," and that to be disabled under the ADA, a plaintiff's condition needs to be permanent or long term.  Further, the Court's independent consideration of the relevant factors — the nature and severity of the impairment, its duration or anticipated duration, and its actual or expected long-term impact — does not support a finding of a disability under the ADA.  Considering the evidence in a light favorable to Green, the Court finds she has not established that she was disabled within the meaning of the ADA.

Even if Green could establish a prima facie case of disability discrimination, Bi-State has satisfied its burden to

present a nondiscriminatory reason for Green's termination — her refusal to perform her duties after receiving a positive return to work evaluation. There is undisputed evidence on the record that indicates this reason was offered at the time of Green's termination. Further, although Green argues that she "was cleared on July 21, 2005 and did return to work on or by July 22, 2005" [Doc. #48, p. 5], there is undisputed evidence that Green left work early on July 25, 2005, and was fired subsequent to leaving that day. Green has offered no evidence demonstrating how Bi-State was motivated by any other reason than her refusal to work.

The Court finds that as a matter of law Green cannot establish a prima facie case of discrimination. Further, the Court finds that even if a prima facie case of discrimination could be established, Green has not met her burden to show that Bi-State's nondiscriminatory reason for her termination was a pretext for illegal discrimination. Accordingly, the Court will grant summary judgment in Bi-State's favor with regard to Green's ADA claim.

**C. State Law Claims**

**1. Outrageous Conduct/Intentional Infliction of Emotional Distress**

Green asserts an outrageous conduct cause of action (Count V), and an intentional infliction of emotional distress cause of action (Count VII). The Court notes that these claims are one and the same. "Modern Missouri tort law now recognizes the

tort theories of (1) intentional infliction of emotional distress, or as sometimes referred to as 'outrageous conduct'...[and] (2) negligent infliction of emotional distress without physical contact...." <u>Kiphart v. Community Fed. Sav. & Loan Ass'n</u>, 729 S.W.2d 510, 516 (Mo. App. 1987); <u>see also</u> <u>Hanks v. General Motors Corp.</u>, 906 F.2d 341, 343 n.2 (8th Cir. 1990) (noting that, under Missouri law, claims for intentional infliction of emotional distress and outrageous conduct "are identical"). Accordingly, the Court will examine both claims as a single claim for intentional infliction of emotional distress.

The elements of the tort of intentional infliction of emotional distress in Missouri are that: "(1) the defendant's conduct was extreme and outrageous; (2) the defendant acted in an intentional or reckless manner; and (3) the defendant's conduct caused severe emotional distress that resulted in bodily harm." <u>Hutchinson v. DaimlerChrysler Corp.</u>, 2007 WL 1726537, at *18 (E.D. Mo. June 14, 2007) (citation omitted). As to the first element, a defendant's conduct has to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." <u>Warrem v. Parrish</u>, 436 S.W.2d 670, 673 (Mo. 1969).

Upon consideration of the facts established for purposes of the instant motion, the Court finds that Green cannot establish

that Bi-State engaged in extreme or outrageous conduct. As noted above, there is insufficient evidence even to demonstrate that Bi-State discriminated or retaliated against Green, much less acted outrageously. Accordingly, the Court will grant summary judgment in Bi-State's favor with regard to Green's claims of outrageous conduct and intentional infliction of emotional distress.

**2. Negligent Infliction of Emotional Distress**

The tort of negligent infliction of emotional distress "is a negligence action." Hutchinson, 2007 WL 1726537 at *19 (internal quotations and citations omitted). Under Missouri law, "[t]he general elements of a negligence action are (1) a legal duty of the defendant to protect the plaintiff from injury, (2) breach of the duty, (3) proximate cause, and (4) injury to the plaintiff." Thornburg v. Federal Express Corp., 62 S.W.3d 421, 427 (Mo. App. 2001) (citation omitted). Further, claims seeking recovery of damages for negligent infliction of emotional distress require proof of two additional elements: (1) that the defendant should have realized that his conduct involved an unreasonable risk of causing distress, and (2) that the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant. See Patterson v. EFPP, LLC, 2007 WL 2507755, at *7 (E.D. Mo. August 30, 2007).

The Court finds that Green's claim of negligent infliction of emotional distress fails because, as with Green's

claim of intentional infliction of emotional distress, Green has not demonstrated the underlying conduct she alleges. Further, she can show neither that Bi-State breached its duty to protect Green, nor that Bi-State should have realized its conduct involved an unreasonable risk of causing distress to Green. Accordingly, the Court will grant summary judgment in Bi-State's favor with regard to Green's claim of negligent infliction of emotional distress.

For all of the foregoing reasons,

**IT IS HEREBY ORDERED** that defendant Metro/Bi-State Development Agency's motion for summary judgment [Doc. #39] is granted.

Dated this __1st__ day of November, 2007.

/s/Donald J. Stohr
UNITED STATES DISTRICT JUDGE